**BIO–TECHNOLOGY GENERAL CORP. and Bio–Technology General (Israel), Ltd., Plaintiffs–Appellants,**

v.

**GENENTECH, INC., Defendant–Appellee.**

No. 95–1471.

United States Court of Appeals, Federal Circuit.

April 8, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined May 20, 1996.

Norman H. Zivin, Cooper & Dunham LLP, New York City, argued for plaintiffs-appellants. With him on the brief were John P. White and Donna A. Tobin. Also on the brief was Cecilia H. Gonzalez, Howrey & Simon, Washington, DC.

Leora Ben–Ami, Rogers & Wells, New York City, argued for defendant-appellee. With her on the brief were Nicholas L. Coch, John E. Kidd, Philip E. Roux and Gerard P. Norton.

Before ARCHER, Chief Judge, and RICH, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Bio–Technology General Corp. and Bio–Technology General (Israel), Ltd. (collectively "BTG") appeal from the decision of the United States District Court for the Southern District of New York granting a preliminary injunction in favor of Genentech, Inc. *Bio–Technology Gen. Corp. v. Genentech, Inc.*, No. 95 Civ. 0110 (CBM) (S.D.N.Y. Aug. 10, 1995) (preliminary injunction order). Because the court did not abuse its discretion in granting a preliminary injunction, we affirm.

## BACKGROUND

Human growth hormone ("hGH") is a 191–amino acid polypeptide hormone secreted by the anterior pituitary gland. It has important metabolic effects, including stimulation of protein synthesis and cellular uptake of amino acids. Genentech is the assignee of two patents relating to hGH that are at issue in this lawsuit. The first patent, U.S. Patent 4,601,980, is directed to a recombinant DNA method for producing a 191– or 192–amino acid human growth hormone product that is identical, or essentially identical, and functionally equivalent to the natural hormone.[1] The product is useful in treating hypopituitary dwarfism in children.

Prior to the '980 invention, hGH could be obtained for therapeutic use only by extracting it from the pituitary glands of human cadavers. Known recombinant DNA methods for producing hGH were deficient; they yielded not only the amino acid sequence of the protein, but also a "leader sequence" of additional amino acids at the beginning of the protein. In the natural synthesis of hGH, the leader sequence enables the protein to emerge from a pituitary cell after expression; the leader is then enzymatically removed. When the product is recombinantly expressed in a bacterial host, however, the leader is not removed and it renders the resulting product biologically inactive.

The invention claimed in the '980 patent solved this problem by providing a method for directly expressing a human growth hormone expression product without a leader sequence. The inventors started with com-

---

1. For discussions of recombinant DNA technology, see *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 18 USPQ2d 1016 (Fed.Cir.), *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991); *In re O'Farrell*, 853 F.2d 894, 895– 99, 7 USPQ2d 1673, 1674–77 (Fed.Cir.1988). The '980 patent is also discussed in *Novo Nordisk of North America, Inc. v. Genentech, Inc.*, 77 F.3d 1364 (Fed.Cir.1996).

plementary DNA ("cDNA") encoding hGH and its leader sequence, and cleaved the cDNA encoding the leader sequence along with a portion of the codons encoding hGH to obtain a cDNA fragment containing hGH codons 24–191. Next, they synthesized a DNA fragment corresponding to the 23 missing codons plus a "start" codon, and fused that DNA fragment to the cDNA fragment. They inserted the resulting *semi-synthetic gene* into bacterial cells, which directly expressed a 192–amino acid product, met-hGH, consisting of the hGH molecule and one additional amino acid, methionine ("met"), coded for by the start codon.[2] Met-hGH has essentially the same biological activity as the natural hormone, hGH. The '980 patent teaches that the amino acid, methionine, may be cleaved intracellularly in the bacterial host to produce a product that is identical to the natural hormone. Genentech sells met-hGH and hGH under the trademarks Protropin® and Humatrope®, respectively.

The second patent in suit, U.S. Patent 4,342,832, also assigned to Genentech, contains essentially the same disclosure as the '980 patent.[3] The '832 patent claims, however, are directed to a method for constructing a replicable cloning vehicle (*e.g.*, a plasmid) capable, in a microbial organism, of expressing a particular polypeptide (*e.g.*, human growth hormone).

Like Genentech, BTG manufactures hGH by recombinant DNA techniques using a plasmid that contains a semi-synthetic gene engineered to express hGH without a leader sequence. BTG incorporates the plasmid into bacteria, which then express insoluble met-hGH in the form of biologically-inactive inclusion bodies. In a final step, BTG carries out a purification process that involves recovering soluble met-hGH free of inclusion bodies and cleaving the extra methionine residue to produce the final product, biologically-active hGH. BTG manufactures hGH in Israel, and it plans to import the product for sale in the United States under the trademark Bio–Tropin®.

BTG filed an Investigational New Drug Application ("IND") for hGH with the Food and Drug Administration ("FDA") in 1985. In 1986, BTG granted American Critical Care ("ACC") an exclusive license under BTG's patents and technology to use and sell hGH in the United States. ACC agreed to make payments to BTG, purchase hGH from BTG, and conduct clinical studies to obtain FDA approval for the product. In 1986, E.I. du Pont de Nemours & Co. ("DuPont") purchased ACC and subsequently became the assignee of the ACC–BTG agreement. During 1986–1987, DuPont paid for and completed human clinical studies directed to the use of hGH to treat growth hormone deficiency in children. In September 1987, DuPont filed a New Drug Application ("NDA") for BTG's hGH product. In 1991 and 1992, BTG reacquired certain rights to the NDA from DuPont. The FDA approved the NDA in May 1995.

In January 1995, BTG sued Genentech in district court, seeking a declaratory judgment that the '980 and '832 patents are invalid, unenforceable, and not infringed by BTG. Genentech counterclaimed for infringement and moved for a preliminary injunction, arguing that BTG's importation of hGH into the United States would infringe the '980 and '832 patents. After a hearing, the district court found that Genentech had established a reasonable likelihood of success on the merits of its counterclaim, since BTG's process for producing hGH was within the literal scope of claim 2 of the '980 patent, BTG's process for making a plasmid was within the literal scope of claim 1 of the '832 patent, and BTG's asserted infringement defenses lacked merit. The court also found that Genentech would suffer irreparable harm absent a preliminary injunction and that the balance of the hardships and the public interest favored the grant of an injunction. The court therefore entered a preliminary injunction against BTG. This ap-

---

**2.** In this opinion, we refer to this 192–amino acid expression product as "met-hGH." We use the term "hGH" to refer to either natural human growth hormone or the identical 191–amino acid expression product.

**3.** The '980 patent is a division of the '832 patent.

peal followed. We have jurisdiction pursuant to 28 U.S.C. § 1292(c) (1994).

## DISCUSSION

■■■ The grant or denial of a preliminary injunction pursuant to 35 U.S.C. § 283 is within the discretion of the district court. *We Care, Inc. v. Ultra–Mark Int'l Corp.*, 930 F.2d 1567, 1570, 18 USPQ2d 1562, 1564 (Fed. Cir.1991). Accordingly, a court's decision granting a preliminary injunction will be overturned on appeal only upon a showing that the court abused its discretion. *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 772, 28 USPQ2d 1378, 1380 (Fed.Cir.1993). An abuse of discretion may be established by showing that the court made a clear error of judgment in weighing the relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings. *Id.*

■■■ As the moving party, Genentech had to establish a right to a preliminary injunction in light of four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the injunction were not granted; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest. *We Care, Inc.*, 930 F.2d at 1570, 18 USPQ2d at 1564; *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451, 7 USPQ2d 1191, 1195 (Fed.Cir. 1988); *Nutrition 21 v. United States*, 930 F.2d 867, 869, 18 USPQ2d 1347, 1349 (Fed. Cir.1991) ("[A]t the preliminary injunction stage, because of the extraordinary nature of the relief, the *patentee* carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement."). If Genentech made a "clear showing" that one of the asserted patents is infringed and is not invalid, then it would be entitled to a presumption of irreparable harm. *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233, 227 USPQ 289, 292 (Fed.Cir.1985).

*A. Likelihood of Success on the Merits*

The district court found it likely that BTG, by importing hGH into the United States, would infringe Genentech's patent under the Process Patent Amendments Act of 1988 ("PPAA"),[4] since BTG's process for making hGH was within the literal scope of claim 2 of the '980 patent and its process for constructing a replicable cloning vehicle (plasmid) was within the literal scope of claim 1 of the '832 patent. *See* 35 U.S.C.A. § 271(g) (West Supp.1995). The court rejected BTG's several asserted defenses.

On appeal, BTG raises numerous challenges to the court's determination of likelihood of success. As discussed below, each of these arguments lacks merit.

### 1. Infringement of the '980 Patent

Claim 2 of the '980 patent reads as follows:

> 2. A method for producing human growth hormone which method comprises [1] culturing bacterial transformants containing recombinant plasmids which will, in a transformant bacterium, express a gene for human growth hormone unaccompanied by the leader sequence of human growth hormone or other extraneous protein bound thereto, and [2] isolating and purifying said expressed human growth hormone.

■■ BTG advances three non-infringement arguments with respect to claim 2. First, BTG contends that the product expressed by the bacterial host cells in its process is not "human growth hormone" as specified in claim 2, but rather is insoluble met-hGH in the form of biologically-inactive inclusion bodies. This argument is unpersuasive.

The '980 specification defines the expression product produced by the claimed process as follows:

> Of course, the expression product will in every case commence with the amino acid

---

4. Congress enacted the PPAA as Title IX of the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107, 1563 (1988) (codified in scattered sections of 35 U.S.C.). The PPAA made it an act of patent infringement to import, sell, or use in the United States, without

authorization, a product made by a process patented in the United States. 35 U.S.C.A. § 271(g) (West Supp.1995). A provision concerning offers to sell was added to § 271(g) by the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809, 4988 (1994) (effective Jan. 1, 1996).

coded for by the translation start signal (in the case of ATG, f-methionine). One can expect this to be removed intracellularly, or in any event to leave the bioactivity of the ultimate product essentially unaffected. Col. 7, 11. 52–57. The specification therefore teaches that the expression product produced by the claimed process is met-hGH, which may or may not be converted to hGH depending on whether or not the extra methionine residue is cleaved intracellularly in the bacterial host. Thus, met-hGH is an expression product within the scope of the claimed process. *See Novo Nordisk of N. Am., Inc. v. Genentech, Inc.,* 77 F.3d 1364, 1368–69 (Fed.Cir.1996) ("[W]e construe the claim term 'human growth hormone' [in claim 2 of the '980 patent] to encompass both met-hGH and hGH.").

Furthermore, at the preliminary injunction hearing there was expert testimony that an "inclusion body" is simply an aggregation of protein chains and that insoluble, biologically-inactive met-hGH that form inclusion bodies is still met-hGH. BTG points to no persuasive evidence to the contrary. Moreover, nothing in the claim language, specification, or prosecution history of the '980 patent indicates that the expression product must be biologically active at the time of expression, before it has been isolated and purified. Rather, the district court found that recombinant expression products, whether formed as inclusion bodies or otherwise, are not biologically active until they are isolated from the bacterial host cells and purified. BTG has not shown any error in that conclusion. Thus, that the met-hGH formed during BTG's process is not biologically active is neither surprising nor meaningful; BTG's isolated and purified final product, hGH, is biologically active. We therefore reject BTG's contention that its product is not "human growth hormone."

■ Second, BTG contends that it uses its own patented purification process to recover soluble, biologically-active hGH from the in-clusion bodies of met-hGH and that the '980 patent does not disclose BTG's unique purification process. Thus, BTG argues that its process does not involve "isolating and purifying" a human growth hormone expression product as required by claim 2. We disagree.

Claim 2 uses broad, generic language to define the steps of isolating and purifying the recombinantly produced hGH product. Nothing in the claim language, specification, or prosecution history suggests that the claim is limited to any particular technique for isolating and purifying the product. Further, BTG's process meets these claim limitations. In its NDA, for example, BTG characterized its recovery of soluble, biologically-active hGH from insoluble, biologically-inactive met-hGH in the form of inclusion bodies as a "purification" step. Similarly, at the preliminary injunction hearing there was expert testimony that these processes constitute a "purification" step within the meaning of claim 2. Thus, BTG's process clearly involves "isolating and purifying [the] expressed human growth hormone," as generically defined in claim 2. That BTG patented its unique purification method is irrelevant: "[T]he existence of one's own patent does not constitute a defense to infringement of someone else's patent. It is elementary that a patent grants only the right *to exclude others* and confers no right on its holder to make, use, or sell." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 879 n. 4, 20 USPQ2d 1045, 1052 n. 4 (Fed.Cir. 1991).

■ Third, BTG argues that, assuming its process falls within the literal scope of claim 2, it "materially changes" the product made by the patented process, met-hGH, into hGH before importing the product into the United States. Thus, BTG contends that its importation of hGH into the United States would not be an act of infringement under 35 U.S.C.A. § 271(g).[5] We disagree. This ar-

5. Section 271(g) provides:
Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.... *A product which is made by a patented process will,* for purposes of this title, *not be considered to be so made after—*

gument is based on an assumption that *met-hGH* is the only "product which is made by [the] process patented in the United States" under § 271(g). However, as indicated above, the production of *hGH* must also be considered to be within the literal scope of claim 2. *See Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1369–70 (Fed.Cir.1996).[6] Thus, BTG's imported product (hGH) is within the scope of claim 2. BTG therefore cannot maintain that the "materially changed" exception to infringement applies, because the product made by the patented process is not changed at all, let alone "materially changed." The "materially changed" exception of § 271(g) requires, at a minimum, that there be a real difference between the product imported, offered for sale, sold, or used in the United States and the products produced by the patented process. If claim 2 were limited to a method for producing met-hGH, then we would have to determine whether BTG's conversion of met-hGH to hGH produced a "materially changed" product. But claim 2 is not so limited and thus BTG's argument lacks merit.

We therefore conclude that BTG has not shown that the district court clearly erred in finding that Genentech established a likelihood of success in proving literal infringement of claim 2 of the '980 patent. *See Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1282, 230 USPQ 45, 46 (Fed.Cir.1986) (literal infringement is established when every limitation of the patent claim is met in the accused device or process).[7]

### 2. *Infringement of the '832 Patent*

■ With respect to claim 1 of the '832 patent, directed to a method of constructing

---

(1) *it is materially changed by subsequent processes;* or
(2) it becomes a trivial and nonessential component of another product.
35 U.S.C.A. § 271(g) (West Supp.1995) (emphasis added).

**6.** An hGH product could be produced by the claimed process by expressing met-hGH followed by intracellular cleavage of the extra methionine residue in the bacterial host, as taught in the '980 specification, and then isolating and purifying the final product.

a replicable cloning vehicle (*e.g.*, a plasmid), BTG argues that it does not infringe because it only constructed the plasmid once, in Israel in 1983, before enactment of § 271(g). BTG contends that the district court erred in retroactively applying § 271(g) to conduct that was not an act of infringement when it occurred. We disagree.

Infringement under § 271(g) does not consist of the making of a product by a process patented in the United States; it is the importation, offer to sell, sale, or use of a product made by such process. 35 U.S.C.A. § 271(g) ("Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer."). Liability arises if "the importation, sale, offer to sell, or use of the product occurs during the term of such process patent." *Id.* BTG clearly intends to import and sell hGH in the United States during the term of the '832 patent. This meets the statutory requirement and does not amount to a retroactive imposition of liability.

Furthermore, the PPAA provides that it "shall apply only with respect to products made or imported after the effective date of the amendments made by this subtitle." Process Patent Amendments Act of 1988, Pub.L. No. 100–418, § 9006(a), 102 Stat. 1107, 1567 (1988). Again, because BTG plans to make and import hGH after the effective date of the PPAA (and during the term of the '832 patent), there is no merit to BTG's contention that the district court retroactively imposed liability on BTG.

■ The more difficult question is whether *hGH* is "a product which is made by a pro-

---

**7.** This case is factually distinguishable from *Novo Nordisk of North America, Inc. v. Genentech, Inc.*, 77 F.3d 1364 (Fed.Cir.1996). In *Novo*, we held that the district court erred in holding that claim 2 of the '980 patent encompasses a cleavable fusion method for producing human growth hormone. Because Novo's process was a cleavable fusion process, there was no literal infringement and we vacated the court's preliminary injunction. BTG's process, however, does not involve cleavable fusion expression and thus the *Novo* decision does not affect our infringement analysis here.

cess patented in the United States," even though claim 1 of the '832 patent is directed to a method for producing a replicable cloning vehicle (*e.g.*, a plasmid), not hGH. The statute does not directly answer this question, because it only defines, at least in part, what products "will ... *not* be considered" to have been "made by" a patented process, namely, those that have been "materially changed by subsequent processes" or that have become "a trivial and nonessential component of another product." 35 U.S.C.A. § 271(g) (emphasis added). The statute does not specify what products will be considered to have been "made by" the patented process, apparently because Congress wanted the courts to resolve this critical question of proximity to the product of the patented process on a case-by-case basis. *See* S.Rep. No. 83, 100th Cong., 1st Sess. 46 (1987) ("Inevitably the courts will have to assess the permutations of this issue of proximity to or distance from the process on a case-by-case basis."); *id.* at 49 ("The Committee expects the courts to exercise careful judgment in distinguishing those products that are too far removed from the patented process, and those that have been changed only in insignificant ways.").

Here, the district court held that hGH is a product that is "made by" the '832 patented process under § 271(g). In so holding, the court relied on the fact that BTG uses the claimed process of making a replicable cloning vehicle as an essential part of an overall process for producing hGH. The court also relied on the legislative history of the PPAA, particularly the Senate Report, which states:

> In the biotechnology field it is well known that naturally occurring organisms contain within them particular genetic sequences composed of unique structural characteristics. The patented process may be for the process of preparing a DNA molecule comprising a specific genetic sequence. A foreign manufacturer uses the patented process to prepare the DNA molecule which is the product of the patented process. The foreign manufacturer inserts the DNA molecule into a plasmid or other vector and the plasmid or other vecot [sic, vector] containing the DNA molecule is, inturn [sic], inserted into a host organism; for

example, a bacterium. The plasmid-containing host organism still containing the specific genetic sequence undergoes expression to produce the desired polypeptide. Even if a different organism was created by this biotech procedure, if it would not have been possible or commercially viable to make the different organism and product expressed therefrom but for the patented process, the [polypeptide] product will be considered to have been made by the patented process.

S.Rep. No. 83, 100th Cong., 1st Sess. 51 (1987).

There is little doubt that the plasmid product of the claimed process and hGH are entirely different materials, one being more than materially changed in relation to the other. hGH is not a mere modification of the plasmid. However, the above excerpt from the legislative history of the PPAA indicates the correctness of the district court's analysis. The legislative history precisely anticipated this fact situation and indicated Congress's intent that infringement of a process for making a plasmid is not to be avoided by using it to express its intended protein. Moreover, the '832 patent itself explicitly contemplates that the patented process will be used as part of an overall process for producing hGH; indeed, the patent discloses in detail how to make hGH by carrying out the claimed process and other necessary steps. Thus, it cannot be said as a matter of law that the production of hGH is too remote from the claimed process of making a replicable cloning vehicle. We therefore find no error in the court's conclusion that hGH is a product that is "made by" the '832 patented process.

Furthermore, since BTG has not shown that the district court erred in determining that BTG's process for making a plasmid falls within the literal scope of claim 1 of the '832 patent, the district court did not err in finding that Genentech established a likelihood of success in proving literal infringement of that claim. *See Mannesmann Demag Corp.*, 793 F.2d at 1282, 230 USPQ at

46.[8]

### 3. BTG's Defenses

#### a. § 271(g)—Grandfather Clause

BTG argues that the "grandfather clause" of the PPAA protects it from liability for infringement under § 271(g). BTG contends that, prior to the effective date of the PPAA, it constructed a plant in Israel for the purpose of manufacturing hGH, filed an IND with the FDA, and licensed ACC (later Du-Pont) to conduct human clinical studies in the United States. The district court found that these activities did not establish that BTG would likely be entitled to equitable protection under the grandfather clause. We find no error in that conclusion.

In section 9006 of the PPAA, Congress provided an exception to liability under the Act as follows:

> (b) Exceptions.—The amendments made by this subtitle shall not abridge or affect the right of any person or any successor in business of such person to continue to use, sell, or import any specific product already in substantial and continuous sale or use by such person in the United States on January 1, 1988, or for which substantial preparation by such person for such sale or use was made before such date, to the extent equitable for the protection of commercial investments made or business commenced in the United States before such date.

Process Patent Amendments Act of 1988, Pub.L. No. 100–418, § 9006(b), 102 Stat. 1107, 1567 (1988). Thus, for the exception to apply, an accused infringer must establish either (1) that its product was already in substantial and continuous sale or use by the accused infringer in the United States on January 1, 1988, or (2) that it made substantial preparation for such sale or use before January 1, 1988. If either (1) or (2) is established, the accused infringer is entitled to continue to use, sell, or import the product to the extent equitable for the protection of its commercial investments made or business commenced in the United States before that date.

Here, the district court did not err in concluding that BTG did not show entitlement to protection under the "substantial and continuous sale or use" provision, since BTG made only sporadic sales of hGH to DuPont in 1986 and 1987 for human clinical studies. In addition, the court did not err in finding that BTG did not undertake "substantial preparation" to sell or use hGH before 1988, because, while BTG raised substantial sums of money from United States investors before 1988, raising money does not constitute "substantial preparation" under the statute. Substantial preparation must consist of activities closely associated with the practice of the claimed invention. One must, for example, invest the money to develop a product or build a plant to make the product in order to meet that test. Moreover, the funds BTG raised were used to support all of its products under development, not just hGH.

Furthermore, even assuming that BTG's construction of a plant in Israel, its filing of an IND, and its agreement with ACC collectively constituted "substantial preparation" to sell or use hGH, the grandfather clause would only entitle BTG to continue to use, sell, or import the product "to the extent equitable for the protection of commercial investments made or business commenced *in the United States* before [January 1, 1988]." The district court found that most of the money BTG raised was invested outside the United States, not in the United States. The court also found that ACC and DuPont, not BTG, paid for and completed the clinical trials and filed an NDA in the United States, and that BTG did not reacquire rights in the NDA until after 1988. BTG has not shown that these findings are clearly erroneous. Thus, based on the present record, the district court did not err in holding that BTG is

---

8. Even assuming, *arguendo*, that the court erred in finding likely literal infringement of the '832 patent, that would not mandate that we vacate the injunction, because the court correctly found a probability of success that BTG literally infringed claim 2 of the '980 patent. Infringement of one valid and enforceable patent claim is all that is required for liability to arise. *E.g., Panduit Corp. v. Dennison Mfg. Co.,* 836 F.2d 1329, 1330 n. 1, 5 USPQ2d 1266, 1267 n. 1 (Fed.Cir.1987) ("One is liable for patent infringement if one claim is infringed.").

not entitled to equitable relief under the grandfather clause.

### b. *Claim Preclusion*

 BTG next argues that the district court erred in not giving claim preclusive effect to a decision of the United States International Trade Commission ("ITC"), which dismissed with prejudice Genentech's complaint under 19 U.S.C. § 1337 (1994) as a sanction for Genentech's purported violation of the ITC's discovery orders. *See In re Certain Recombinantly Produced Human Growth Hormones,* Inv. No. 337–TA–358 (Int'l Trade Comm'n Jan. 17, 1995) (decision denying review of final initial determination), *appeal docketed sub nom. Genentech, Inc. v. United States Int'l Trade Comm'n,* No. 95–1244 (Fed.Cir. Mar. 17, 1995). BTG contends that Genentech is attempting to relitigate in district court the same claim it lost before the ITC. We cannot accept this contention.

 The decision of an administrative agency potentially may be given preclusive effect when, as here, the agency acted in a judicial capacity. *See University of Tenn. v. Elliott,* 478 U.S. 788, 797–99, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986). That the ITC did not reach the substantive question of infringement does not prevent application of claim preclusion. *See Angel v. Bullington,* 330 U.S. 183, 190, 67 S.Ct. 657, 661, 91 L.Ed. 832 (1947) ("It is a misconception of *res judicata* to assume that the doctrine does not come into operation if a court has not passed on the 'merits' in the sense of the ultimate substantive issues of a litigation.").

 Under the principle of claim preclusion, "a party must raise in a single lawsuit all the grounds of recovery arising from a single transaction or series of transactions that can be brought together." *Mars Inc. v. Nippon Conlux Kabushiki–Kaisha,* 58 F.3d 616, 619, 35 USPQ2d 1311, 1314 (Fed.Cir. 1995); *see Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992) (application of claim preclusion depends on whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second judgment were pres-

ent in the first); *Restatement (Second) of Judgments* § 24 (1982) (all actions arising from the same transaction or series of transactions constitute a single claim for purposes of claim preclusion).

However, the bar against later claims based on the same transactional facts is "subject to certain limitations, one of which is that it will not be applied if the initial forum did not have the power to award the full measure of relief sought in the later litigation." *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986). As stated by the Restatement:

> The general rule [against relitigation of a claim] is largely predicated on the assumption that the jurisdiction in which the first judgment was rendered was one which put no formal barriers in the way of a litigant's presenting to the court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law. When such barriers in fact existed and were operative against a plaintiff in the first action, it is unfair to preclude him from a second action in which he can present those phases of the claim which he was disabled from presenting in the first.

*Restatement* § 26(1)(c) cmt. c. "Thus, where a plaintiff was precluded from recovering damages in the initial action by formal jurisdictional or statutory barriers, not by plaintiff's choice, a subsequent action for damages will not normally be barred by res judicata even where it arises from the same factual circumstances as the initial action." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

This limiting principle is applicable here. Under section 337 of the Tariff Act of 1930 as amended, 19 U.S.C. § 1337, the ITC has the authority to investigate unfair practices in import trade, including:

> (B) [t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that—
>
> (i) infringe a valid and enforceable United States patent . . .; or

(ii) are made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent.

19 U.S.C. § 1337(a)(1)(B) (1994).

When the ITC determines that a defendant has engaged in unfair practices in import trade, it may direct that the articles at issue be excluded from entry into the United States, 19 U.S.C. § 1337(d), issue a cease and desist order, 19 U.S.C. § 1337(f), and/or issue an order providing that the articles in violation be seized and forfeited to the United States, 19 U.S.C. § 1337(i). Importantly, however, the ITC does not have the power to award damages for patent infringement. This form of relief may only be provided by the United States District Courts, which have original and exclusive jurisdiction over patent infringement cases. *See* 28 U.S.C. § 1338(a) (1994).

The legislative history of the Trade Reform Act of 1974 supports the view that ITC decisions with respect to patent issues should have no claim preclusive effect in later district court litigation:

> The Commission is not, of course, empowered under existing law to set aside a patent as being invalid or to render it unenforceable, and the extent of the Commission's authority under this bill is to take into consideration such defenses and to make findings thereon for the purposes of determining whether section 337 is being violated.
>
> . . . [I]n patent-based cases, the Commission considers, for its own purposes under section 337, the status of imports with respect to the claims of U.S. patents. The Commission's findings neither purport to be, nor can they be, regarded as binding interpretations of the U.S. patent laws in particular factual contexts. Therefore, it seems clear that any disposition of a Commission action by a Federal Court should not have a res judicata or collateral estoppel effect in cases before such courts.

S.Rep. No. 1298, 93d Cong., 2d Sess. 196 (1974) U.S.Code Cong. & Admin.News 1974, p. 7186. We note that "the ITC takes the position that its decisions have no *res judicata* effect in [district court] litigation." *Corning Glass Works v. United States Int'l Trade Comm'n,* 799 F.2d 1559, 1570 n. 12, 230 USPQ 822, 830 n. 12 (Fed.Cir.1986).

Thus, in view of the jurisdictional limitations on the relief available in the ITC, we hold that the ITC's prior decision cannot have claim preclusive effect in the district court. *See also Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 851 F.2d 342, 344, 7 USPQ2d 1509, 1510 (Fed.Cir. 1988) ("[T]his court has stated that the ITC's determinations regarding patent issues should be given no res judicata or collateral estoppel effect.").[9]

### c. *Laches and Estoppel*

BTG also contends that laches bars Genentech's infringement counterclaim. BTG asserts that in 1985 and 1986, Genentech knew that BTG had developed an hGH product and imported it into the United States for use in clinical trials. BTG contends that Genentech should have brought suit against BTG soon after it learned of this information. We disagree.

Prior to 1988, when § 271(g) became effective, importation of a product made abroad by a process patented in the United States was not an act of infringement. Thus, Genentech had no infringement claim against BTG before 1988. With no legal right to enforce, it cannot be said that Genentech unreasonably delayed during that time period.

Furthermore, even after § 271(g) was enacted in 1988, BTG was only importing hGH into the United States for use in clinical trials in support of its application for FDA approval. The district court found that this was non-infringing activity, *see* 35 U.S.C.

---

**9.** In *Young Engineers, Inc. v. United States International Trade Commission,* 721 F.2d 1305, 219 USPQ 1142 (Fed.Cir.1983), we held that a district court decision resolving a patent infringement claim may have claim preclusive effect in a subsequent § 1337 investigation based on the same assertion of infringement. *Id.* at 1313–16, 721 F.2d 1305, 219 USPQ at 1150–52. For the reasons stated above, however, the reverse is not true.

§ 271(e)(1) (1988),[10] and that Genentech did not know before 1993 that BTG had imported hGH into the United States for purposes outside the scope of § 271(e)(1). BTG has not demonstrated error in these findings. Thus, we conclude that the court did not err in rejecting BTG's laches defense.

BTG also argues, in conclusory fashion, that

Genentech, through misleading conduct, led BTG to infer that Genentech did not intend to enforce the patents against it. BTG relied on such conduct, and will be severely harmed if Genentech now is permitted to enforce its patents. Thus, Genentech's infringement suit is barred under the doctrine of equitable estoppel.

We disagree. BTG cites no evidence to support its assertion; thus, on the present record, there is no factual basis for an estoppel defense.

### d. Validity/Enforceability

BTG does not contend that the '980 and '832 patents are invalid in view of the prior art or for failure to meet the enablement or other requirements of 35 U.S.C. § 112. Rather, BTG argues, first, that Genentech admitted that its patent position is "weak." The district court did not err in rejecting this contention, because BTG relied on documents found inadmissible by the district court. On appeal, BTG has not demonstrated that the court's evidentiary ruling was in error; thus, we will not further consider this argument.

BTG also argues that the inventors named in the asserted patents did not actually conceive the inventions claimed therein. BTG again cites evidence that the district court found inadmissible, and BTG has not shown that the court's evidentiary ruling was erroneous. Thus, we reject this argument.

■ BTG further argues that Genentech "misappropriated inventions, materials, people and information" from the University of California ("UC"), and that the asserted pat-

ents are unenforceable because Genentech did not disclose its "misappropriation" to the United States Patent and Trademark Office during patent prosecution. We disagree. The district court found that BTG's witness on this issue, Dr. Goodman, gave testimony that "was at best inconclusive and entitled to no weight" and that he "did not provide any probative testimony in support of the allegation that Genentech misappropriated the inventions, or indeed, anything at all, from UC." On appeal, BTG has not shown that the district court erred in evaluating the credibility of Goodman's testimony. BTG addresses the Administrative Law Judge's findings in the ITC case; however, these arguments do not show error in the district court's findings.

■ BTG also argues that the unclean hands doctrine bars Genentech's infringement counterclaim, because Genentech allegedly violated the ITC's discovery orders and "misappropriated" the '980 and '832 inventions from scientists at the University of California. Again, we must disagree. These assertions are largely without evidentiary support in the record. In addition, as the district court found, the purported misconduct did not occur in the context of the present lawsuit. Thus, the court did not err in rejecting BTG's unclean hands defense. *See Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir.1983) ("[T]he defense of unclean hands applies only with respect to the right in suit.").

We therefore conclude that BTG has not shown that the district court clearly erred in finding that Genentech established a reasonable likelihood of success on the merits of its infringement counterclaim.

### B. Irreparable Harm

■ BTG next argues that the district court's finding of irreparable harm is clearly erroneous. We disagree. The court correctly held that Genentech was entitled to a presumption of irreparable harm because Genentech made a strong showing of in-

---

**10.** In 1988, § 271(e)(1) provided that "[i]t shall not be an act of infringement to make, use, or sell a patented invention ... solely for uses reasonably related to the development and submis-

sion of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products." 35 U.S.C. § 271(e)(1) (1988).

fringement and validity, and BTG's asserted defenses lacked substantial merit. *See Nutrition 21,* 930 F.2d at 871, 18 USPQ2d at 1351 (district court may presume irreparable harm upon a clear showing of infringement and validity). BTG did not come forward with persuasive evidence to rebut the presumption of irreparable harm. In addition, the district court determined that Genentech would be harmed if BTG were allowed to enter the market because Genentech would lose revenues and goodwill, and would be required to reduce its research and development activities. BTG has not demonstrated that these findings are clearly erroneous.

### C. *Other Factors*

The district court found that the balance of the hardships and the public interest favored entering a preliminary injunction. BTG challenges these findings; however, having carefully considered BTG's arguments, we find no error in the district court's analysis of these factors.

In addition, we have considered BTG's remaining arguments, including its contentions concerning alleged procedural errors, but find them unpersuasive.

### CONCLUSION

The district court did not err in finding that Genentech established a reasonable likelihood of success on the merits of its infringement counterclaim. The court also did not err in finding that Genentech would suffer irreparable harm absent an injunction and that the balance of the hardships and public interest considerations favored the grant of an injunction. Further, the court did not make a clear error of judgment in weighing the relevant factors. Thus, we conclude that the court did not abuse its discretion by granting a preliminary injunction.

No costs.

**AFFIRMED.**