NORIAN CORPORATION, Plaintiff and Counterclaim–Defendant,

v.

STRYKER CORPORATION, Defendant and Counterclaim–Plaintiff.

No. C 01–00016 WHA.

United States District Court, N.D. California.

June 13, 2002.

David R. Owens, Pennie & Edmonds LLP, Palo Alto, Brian M. Poissant, Thomas G. Rowan, Daniel Malone, Pennie & Edmonds LLP, Kelly Talcott, Pennie & Edmonds, LLP, New York, NY, for Norian Corporation, Plaintiff.

Edward W. Remus, Timothy J. Malloy, Gregory J. Vogler, Sandra A. Frantzen, Michael B. Harlin, Alejandro Menchaca, John L. Abramic, McAndrews Held & Malloy, Chicago, IL, Morgan W. Tovey, William Overend, Crosby Heafey Roach & May, San Francisco, for Stryker Corporation, defendant.

## ORDER DENYING MOTION FOR NEW TRIAL AND GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT

ALSUP, District Judge.

### INTRODUCTION

As this order on post-trial motions will be the last ruling by the district court before appeal, the following procedural summary may assist the court of appeals. Although some relief is required under FRCP 50, the ultimate outcome is not changed. Judgment for defendant is still required.

### PROCEDURAL HISTORY

On January 3, 2001, plaintiff Norian Corporation commenced this action against defendant Stryker Corporation, alleging that its BoneSource product infringes United States Patent Nos. 5,336,264 and 6,002,065. The '264 patent is entitled "Situ Prepared Calcium Phosphate Composition and Method." It is directed to methods for preparing calcium-phosphate compositions that form hydroxyapatite, a fundamental building block of human bone. The '065 patent is entitled "Kits for Preparing Calcium Phosphate Materials." It is directed to kits for preparing calcium-phosphate compositions. Both concern compositions for medical applications, *i.e.,* to repair bones. One alleged point of novelty was the use of a sodium-phosphate solution to achieve short setting times for the compositions.

In response, Stryker alleged counter-claims as to noninfringement, invalidity and unenforceability. On the same day that Stryker filed its answer, it moved for a summary judgment of noninfringement. An order dated April 20, 2001, denied summary judgment as to Claims 1–8 of the '264 patent but granted it as to Claims 1–10 of the '065 patent. In particular, the order held that: (1) monetite may be a "phosphoric acid source" as that term is used in Claim 1 of the '264 patent; and, (2) in the '065 patent, the phrase "consisting of" means the claimed "kit" exclusively includes the items enumerated thereunder and does not include unspecified items, like a spatula (which the BoneSource kit had). From this point on, the '264 patent was the only patent litigated.

There were two full rounds of extensive briefing and oral argument on the meaning of the '264 patent—once on Stryker's referenced motion for summary judgment and later on for the *Markman* hearing. A final claim-construction order was issued on October 12, 2001. Nine disputed claim phrases and terms from Claims 1, 2, 3 and 7 were construed.

On February 13, 2002, three orders on four motions for summary judgment were issued. The first order, entitled "Order Granting in Part Summary Judgment on Infringement in Plaintiff's Favor," held that Stryker's sale (beginning in December 1998) of both (1) its BoneSource powder with instructions for obtaining and adding a commercially-available sodium-phosphate solution to that powder, and (2) its so-called BoneSource Cement Kits with instructions for adding an included sodium-phosphate solution to the BoneSource powder induced infringement of Claims 1, 7 and 8 of the '264 patent. The order pertained only to Stryker's own conduct, not alleged infringement by predecessors, the latter being reserved for trial.

The second order, entitled "Order on Summary Judgment re Equitable Defenses," disposed of Stryker's equitable-estoppel defense. Norian's parallel attack on laches was denied. Evidence on laches was to be received at trial, although the issue was to be decided by the Court.

The third order, entitled "Order Denying Plaintiff's Motion for Partial Summary Judgment re Extended Abstracts and Denying Defendant's Motion for Summary Judgment," ruled on the sufficiency of Stryker's invalidity defenses and Stryker's motion for summary judgment of invalidity, noninfringement and unpatentability. It held that triable issues existed on whether: (1) certain references—including the 1991 IADR Extended Abstract and the 1992 AADR Extended Abstract—advanced by Stryker were "printed publications" under § 102(a) or § 102(b); (2) certain co-authors of the 1991 IADR Extended Abstract (namely, Drs. Chow and Tagaki) were prior inventors of the subject matter of the '264 patent under § 102(g); (3) the subject matter of the '264 patent was previously known or used by the authors of the IADR and AADR Extended Abstracts under § 102(a); (4) the '264 patent was anticipated under § 102(b) by United States Patent No. 33,161 ('161 Brown and Chow patent); and, (5) Claim 2 of the '264 patent was not infringed. In addition, the order held that Claim 7 of the '264 patent did not improperly claim unpatentable subject matter in violation of Section 101. The defense of obviousness was not presented for ruling.

On March 13, 2002, an order issued eliminating Stryker's inequitable-conduct defense. It held that the applicants' incorrect statements to the PTO distinguishing the '161 Brown and Chow patent could not support an inequitable-conduct finding. Specifically, the '161 Brown and Chow patent was clearly before the examiner as it

was significantly and actively debated and twice solely relied on to disallow the pending claims.

To settle a standing question, an order filed on March 27, 2002, held that Norian had standing to assert the '264 patent herein. It concluded that there were no triable issues concerning Pennsylvania State University's legal title to the '264 patent. Specifically, any factual dispute at most pertained to whether the university had a possible equitable interest in the '264 patent. As such, Norian's legal title and, thus, standing was not undercut.

Trial commenced on April 15, 2002, and lasted ten days (plus jury deliberations). Infringement having been established on summary judgment, at least from the date Stryker acquired BoneSource rights, what remained for the jury were the issues of willful infringement, invalidity and damages concerning Claims 1, 7 and 8 of the '264 patent, the specific claims Norian chose to prosecute at trial. During trial, pursuant to FRCP 50, the Court granted Stryker's motion to dismiss willful infringement and Norian's motion to reject the laches defense.

The case went to the jury on the issues of invalidity (as to three theories) and reasonable royalty. By a special verdict returned on May 2, 2002, the jury found that: (1) Stryker had proven by clear and convincing evidence that Claims 1, 7 and 8 of the '264 patent were anticipated by the 1991 IADR Extended Abstract; (2) Stryker had not proven by clear and convincing evidence that Claims 1, 7 and 8 were invented by Drs. Chow and Tagaki before July 23, 1992 (the filing date of the '264 patent application); (3) Stryker had proven by clear and convincing evidence that Claims 1, 7 and 8 would have been obvious to one of ordinary skill in the art on or before July 23, 1992, in light of the '161 Brown and Chow patent or the '161 Brown and Chow patent plus United States Pat-

ent No. 5,092,888 ('888 Iwamoto patent); and (4) Norian had not carried its burden to prove up a reasonable royalty rate. The jury had been instructed to reach the last issue regardless of its verdict as to invalidity.

Norian has now filed two post-trial motions: one for judgment as a matter of law and the other for a new trial. Both are now addressed, organized by substantive trial issues, most of which issues arise under both motions.

**STANDARD OF REVIEW**

■ For a judgment as a matter of law under FRCP 50, the moving party must show "there is no legally sufficient evidentiary basis for a reasonable jury to find" for the nonmovant on an issue. The record is reviewed to "ascertain whether there was substantial evidence presented at trial to support the findings necessary to the jury's verdict. The evidence presented at trial must be considered in the light most favorable to the jury's verdict, drawing reasonable factual inferences and resolving issues of credibility in favor of the verdict." *Bio. Technology General Corp. v. Genentech, Inc.*, 267 F.3d 1325, 1329 (Fed.Cir.2001) (citations omitted). A jury's verdict may be overturned "only if, upon the record before the jury, reasonable jurors could not have reached that verdict." *Electro Scientific Indus., Inc. v. General Scanning Inc.*, 247 F.3d 1341, 1349 (Fed.Cir.2001).

■ A new trial under FRCP 59 is warranted, "even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1374 (Fed.Cir.2001). A new trial is not war-

ranted if the jury's verdict is not against the clear weight of the evidence. "When granting a new trial, a trial court may weigh the evidence and credibility of the witnesses, but it may not grant a new trial 'merely because it might have come to a different result from that reached by the jury.'" *Ibid.*

If at the end of a party's case, the opposing party makes a proper motion under FRCP 50 and renews it at the end of trial, the opposing party is entitled to its legal arguments made on its initial FRCP 50 motion even if it did not object to contrary or inconsistent jury instructions. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 973–75 (Fed.Cir.1995). On the other hand, a party who does not object to a jury instruction may not argue a contrary position of law in order to obtain a new trial under FRCP 59. *Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1281–84 (Fed.Cir. 2000).

## ANALYSIS

### I. OBVIOUSNESS.

It is best to begin with the issue of obviousness for it will also serve as useful background for all motions pending. Based on the trial evidence, this order holds that the jury could reasonably have found the claims-in-suit would have been obvious in light of the two prior-art references relied on by Stryker, namely the '161 Brown and Chow patent (TX 55) and the '888 Iwamoto patent (TX 606). The verdict was not against the clear weight of the evidence. This order rejects Norian's post-trial motions seeking to overturn the jury's verdict of obviousness.

Claim 1 of the '264 patent reads as follows:

1. A method for preparing a rapid setting calcium phosphate composition capable of rapidly setting up in a viable mammalian host, said method comprising:

combining with mixing dry precursors for producing a calcium phosphate mineral composition, said precursors comprising a calcium source and a phosphoric acid source free of uncombined water;

combining said combined precursors with a lubricant at a pH in the range of 6–11, wherein said lubricant comprises a member selected from the group consisting of phosphate and carbonate and is from about 15 to 70 weight percent of the total composition;

to form a rapidly setting flowable composition.

The '161 Brown and Chow patent had already disclosed the basic idea of mixing two dry powders (a calcium source and a phosphoric-acid source) with an aqueous solution to form a slurry or paste, which would then harden into a bone-like composition. In fact, BoneSource, the accused product, was the result of a license granted by the owners of the '161 Brown and Chow patent to Stryker's predecessors in interest. Norian's '264 patent improved on the '161 Brown and Chow patent by substituting a phosphate or carbonate solution in place of the aqueous solution, *i.e.,* water. In other words, the '264 patent used the same dry powders for its starting point but then added a sodium-phosphate solution (or other phosphate or carbonate solution) rather than water to achieve rapid setting times. The key difference was the phosphate or carbonate lubricant. After Norian's '264 patent issued, Stryker's predecessors began, in effect, instructing BoneSource customers to use the method of the '264 patent. Stryker continued to do so when it took over the sale of Bone-Source in 1998.

Interestingly, the '161 Brown and Chow patent had, in fact, disclosed adding sodium-phosphate as follows (Col.11:4–13):

In addition, four groups of compound may be added to the liquid phase of the remineralization slurry. Alternatively, these compounds can be added to the dry powder demineralizing combinations. First, fluoride compounds such as ... may be added to increase the rate of mineralization. Second, calcium and phosphate containing compounds such as ... $(NH_4)H_2PO_4$ [sodium phosphate] may be added to modify the Ca/ P ratio and pH of the solution's singular point. At trial, Norian construed this to mean that the sodium phosphate was added either (i) as a dry powder to the other dry powders (before any liquid was added) or (ii) as a dry powder to the slurry already containing the other dissolved dry powders. Norian contended it was not added as a dry powder to water, which solution was then mixed with the other dry powders. The last scenario is the method of the claims-in-suit. On the other hand, Stryker's expert contended there was no magic to the sequence of steps and that all scenarios would have been seen as interchangeable and would have produced the same "rapidly-setting flowable composition" (Tr. 1028–29, 1074–76). Still, the '161 Brown and Chow patent had not called out the scenario of dissolving the sodium phosphate in the water before adding the usual dry powders.

For the sake of further precision, moreover, it must be noted that the '161 Brown and Chow patent had disclosed the use of sodium phosphate *only to modify the Ca/P ratio and the pH of the solution's singular point* (Col.11:11–13). It had *not* suggested that sodium phosphate would affect the setting time. Elsewhere, the specification had suggested "[ ] the setting time for a given cement may be reduced by adding hydroxyapatite or fluorapatite seed crystals" (Col.11:56–58). Fluoride compounds had also been cited as setting-time reducers (Cols.11:58–12:1). Those possibilities, however, had nothing to do with sodium

phosphate. This order holds that there had been no suggestion in the '161 Brown and Chow patent to adjust setting times via a phosphate or carbonate solution.

This gap, however, was supplied by the '888 Iwamoto patent, conceded by all to qualify as prior art. That patent had expressly described "a hardening material having excellent performances as a bone-restoring hardening material" (Col.1:8–9). The '888 Iwamoto patent had expressly discussed the '161 Brown and Chow patent and the usual dry precursors used in that patent (Col.1:35–44). The '888 Iwamoto patent also expressly had disclosed the use of phosphates—including sodium phosphate—to adjust the setting time: "Moreover, hydroxyapatite, silica, calcium fluoride, titanidum [sic titanium] dioxide, calcium hydroxide, alumina, *sodium phosphate* or *ammonium phosphate* can be added so as to adjust the setting time and the strength" (Col.4:20–24) (emphasis added). All of the example compositions set forth in the '888 Iwamoto patent had rapid-setting times, as defined in claim construction and the final charge, even without the benefit of the adjustment in setting times. Stryker's expert testified regarding the disclosures of the '888 Iwamoto patent (Tr. 1092–93) (emphasis added):

Q. Okay. What does the Iwamoto patent show that's, in your view, relevant to the Norian patent claims?

A. What it states that sodium phosphate or ammonium phosphate can be used to adjust the setting time; that's in Column 4, Lines 20 through 24.

    *     *     *     *     *     *

Q. Why don't you tell us what that says and then what it means?

A. "Moreover hydroxyapatite, silica calcium fluoride, titanium dioxide— titanium, that's badly spelled—calcium hydroxide alumina, *sodium*

*phosphate or ammonium phosphate can be added so as to adjust the setting time and the strength."*

Q. Let me start there. What are these materials being added to in the Iwamoto patent?

A. These are being added either to the dry solid—because titanium dioxide, alumina and silica would be solids—or to the liquid phase. And, as I mentioned, when you use very soluble compounds, it's immaterial where the soluble compounds are added.

Q. And what are the powders, the exact powders that you—

A. *The exact powders are the powders of the Brown & Chow. In fact, it refers to the Brown & Chow patent in this patent. It's tetracalcium and dicalcium phosphate.*

Q. So is the Iwamoto patent adding sodium phosphate and ammonium phosphate to those powders?

A. Yes.

Q. And for what purpose?

A. *To investigate how it so-called "adjusts" the setting time.*

Q. And how would you understand that?

A. I think anyone of ordinary skill— not anyone. *Someone of ordinary skill in the art would know that the setting time would be reduced, just because of the phosphate going into the system.*

Although Norian argues that "adjust" did not necessarily mean "reduce," one of ordinary skill in the art would have known that the direction of change due to a phosphate would have been a reduction or so a reasonable jury could have concluded based on the trial evidence.

It is true that the '888 Iwamoto patent did not expressly call out adding the sodium phosphate in *solution* form. But it did call for adding sodium phosphate and it did so for the purpose of altering the setting time. The trial testimony was convincing that those skilled in the art would have known that there would be very little difference between adding the sodium phosphate to the dry precursors versus adding it to the pure water lubricant versus adding it to the water plus other dry precursors.[1] A jury could reasonably have

1. Specifically, Stryker's expert testified (Tr. 1074–76) (emphasis added):
   Q. Dr. Nancollas, may I ask a question? On Column 11, Lines 1 to 13 [of '161 Brown and Chow patent], what does that teach a person of ordinary skill in the art? What is that teaching to a person of ordinary skill in the art?
   A. *That you can add these compounds, soluble compounds, either to the liquid phase of the slurry or to the lubricant before it's used.*
   Q. Okay, could you show—
   A. Yes. We can think of three boxes to simplify this problem. First of all, we have the dry precursors, which we said before, TTCP, tetracalcium phosphate, plus dicalcium phosphate, and this is dry. These are the dry powders.
   Forgive my writing. My students always complain about it. On the other hand, we have the sodium phosphate, which is a powder. It's—as you buy it, it's a dry powder in another box. Then down here, we have a liquid. Okay.
   *Two of the possibilities are that you take the sodium phosphate dry powder, put it into the liquid and, as I said before, it dissolves extremely rapidly. It disappears as sodium and phosphate ions, and then you add the dry precursors to that mixture.*
   *In other words, you're adding the dry precursors to the sodium phosphate solution. That's one possibility.*
   Q. And what's produced?
   A. *Oh, calcium phosphate cement.*
   Q. Okay.
   A. That was the reaction I showed you before. *Another possibility is if you take the sodium phosphate powder and you mix it with these dry powders to make a mixture, and then you throw all of that into*

credited Stryker's expert, who had substantially more experience in the field in question than the opposing expert, with respect to his view that those skilled in the art would have previously earned a doctorate in science and had experience in developing biomedical materials. A jury could reasonably have found, as the expert opined, that one of ordinary skill in the art, when presented with the '161 Brown and Chow and '888 Iwamoto patents, would have known that the addition of sodium phosphate to the lubricant would have achieved the setting times defined as "rapidly setting" within the meaning of Claim 1. The verdict was not against the weight of the evidence.[2]

As for Claims 7 and 8, both the '161 Brown and Chow and the '888 Iwamoto patents expressly disclosed cement compositions for medical applications, i.e., fill cavities and repair bones. For example, the '161 Brown and Chow patent stated (Col.9:25–30, 9:36–37):

> The cements of the present invention may be used in place of any of the cements known in the prior art as: (i) cavity bases and liners to protect the pulp; (ii) materials for capping exposed pulps;

(iii) materials to replace or promote regeneration of bone mineral lost due to periodontal disease;

\* \* \* \* \* \*

(ix) a replacement of bone that has been removed surgically or lost due to trauma.

The '888 Iwamoto patent stated (Col.4:40–44):

> Especially, the hardening material of the present invention is preferably used as a restorative material such as a cavity lining material, a luting cement, a filling cement or a plastic restoration bone cement.

Claims 7 and 8 would likewise have been obvious or so the jury could reasonably have concluded.

## II. THE 1991 IADR EXTENDED ABSTRACT.

The jury found that all of the claims-in-suit were anticipated by the 1991 IADR Extended Abstract (TX 113). Norian now challenges that conclusion.

### A. Recognition and Enablement.

■ The 1991 IADR Extended Abstract (TX 113) described a method that fell within Claim 1. Although the abstract focused

> the liquid phase. The sodium phosphate dissolves so rapidly. It's twice the solubility of common salt, that it's essentially the same thing. The sodium phosphate dissolves rapidly and you have essentially the same system as we had before. So the sodium phosphate can either be put into the liquid, the lubricant.
> Q. And what does that produce?
> A. Calcium phosphate cement. Or you can mix it with the dry powders and then put the whole thing into the liquid. That makes, also, the same calcium phosphate cement.
> Q. When you put the sodium phosphate powder into the liquid, what is that? What do you get?

> A. It dissolves immediately to form sodium and phosphate ions.

2. Claim 1, moreover, does not require a reduction in setting times. It only requires "rapidly setting," which was defined to mean: "Rapidly setting" means that the calcium phosphate composition may harden almost immediately, usually the maturing process should take at least two minutes, usually about eight minutes and not more than thirty minutes, usually not more than about twenty-five minutes. (Final Charge XV). All of the compositions reported in the '888 Iwamoto patent expressly had setting times well within this definition, even before resorting to sodium phosphate to adjust the setting time.

on a "protein bioadhesive" (PBA) to accelerate the setting time, the abstract expressly stated that the PBA solution included sodium phosphate in its liquid phase (TX 113 at 3–4). Anyone practicing the 1991 recipe would have been subject to an infringement suit once the '264 patent issued. Long ago, the Supreme Court held "that which infringes, if later, would anticipate, if earlier." *E.g., Knapp v. Morss*, 150 U.S. 221, 228, 14 S.Ct. 81, 37 L.Ed. 1059 (1893). Norian acknowledges that all the elements were in the abstract but dismisses it as having failed to recognize the important role of sodium phosphate.

It is true that the abstract failed to recognize the important role of sodium phosphate as a setting agent. The abstract gave PBA the credit. Nonetheless, this point does not aid Norian. While "teaching away" has a venerable role respecting obviousness, it has no role respecting anticipation. *Celeritas Tech., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360–61 (Fed.Cir.1998). The claimed elements were all there, even if embellished with nonfunctional adornments.

So too as to enablement. Again, the abstract set forth a method that, if followed, would infringe Claim 1. It was thus enabled. Acknowledging again that the authors focused on PBA to achieve a fast setting time, the law remains that anticipation is not defeated merely because a reference failed to recognize the proper cause-and-effect relationship. *Titanium Metals Corp. of America v. Banner*, 778 F.2d 775, 781 (Fed.Cir.1985). The PBA solution contained sodium phosphate in an appropriate dosage. A patent cannot take away the public's right to use art that is already in the public domain merely because patentees later and more precisely discover the true scientific properties of the prior art. *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347–48 (Fed.Cir.1999)

("The public remains free to make, use, or sell prior art compositions or processes, regardless of whether or not they understand their complete makeup or the underlying scientific principles which allow them to operate").

## B. Corroboration.

■ Norian's main point is that the jury instructions should have insisted on corroboration for the public-accessibility element of the printed-publication requirement. The jury was instructed that Stryker had to prove that the abstract qualified as a printed publication, including public accessibility, by clear and convincing evidence. Specifically, the jury was instructed in pertinent part as follows (Final Charge XXI, at 11):

... If a copy of the abstract was taken to a conference but not made accessible, then as a matter of law, that abstract would not have been a printed publication. On the other hand, if copies of an abstract were taken to a conference well attended by persons interested in and of ordinary skill in the art and made reasonably accessible to all attendees requesting it, then that abstract would have been a printed publication. An abstract is reasonably accessible when persons interested and of ordinary skill in the art exercising reasonable diligence could have obtained the abstract if they wanted, and it was made available without restriction. This means that conference attendees interested and of ordinary skill must at least have been advised of the abstract's existence, informed of its contents and had reasonable access to it. If accessibility is proven, there is no requirement to show that particular members of the public actually received the information.

In determining whether an abstract was accessible to conference attendees inter-

ested and of ordinary skill in the art, you may consider evidence of normal routine and business practices. You may consider evidence of routine practice by the presenters of the abstract in addition to the routine practice by the event coordinators of the conference. You are not, however, bound by their testimony. How much weight you give to their testimony is entirely up to you. The burden of proof is on Stryker. Stryker must prove the abstract qualified as a printed publication by clear and convincing evidence.

The issue concerns corroboration—more specifically, whether the jury should have been told that corroboration was required as a matter of law for the sub-element of "public accessibility," one of the requirements to prove that the 1991 IADR Extended Abstract constituted a "printed publication." *Massachusetts Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir.1985). Specifically, the issue comes down to whether there must be corroboration that copies of the abstract were available at the presentation of the paper for handout upon request.

Norian argues that *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354 (Fed. Cir.1999), held that, over and above the clear-and-convincing burden for invalidity, corroboration is always required for any and all invalidity defenses under 35 U.S.C. 102. *Finnigan* stated:

> While this court has in the past applied the requirement of corroboration more often in the context of priority disputes under 35 U.S.C. § 102(g), corroboration has been required to prove invalidity under other subsections of § 102 as well. In the context of § 102(f) (derivation) and § 102(g) (priority), we have stated that "the case law is unequivocal that an inventor's testimony respecting facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof." *Price v. Symsek*, 988 F.2d 1187, 1194, 26 U.S.P.Q.2d 1031, 1036 (Fed.Cir. 1993). *No principled reason appears for applying a different rule when other subsections of § 102 are implicated:* a witness's uncorroborated testimony is equally suspect as clear and convincing evidence if he testifies concerning the use of the invention in public before invention by the patentee (§ 102(a)), use of the invention in public one year before the patentee filed his patent (§ 102(b)), or invention before the patentee (§ 102(g)).

*Id.* at 1367 (emphasis added).

At the summary-judgment stage, the Court cited to the passage just quoted and indicated (in a dictum) that the italicized passage implied that the corroboration requirement might reach all subsections of Section 102 (Order Denying Plaintiff's Motion for Partial Summary Judgment Re Extended Abstracts and Denying Defendant's Motion for Summary Judgment 6 n. 6).[3] Upon due consideration over the course of the trial, however, the Court became less convinced. Norian's proposed instruction requiring corroboration on this element was ultimately rejected. The

---

**3.** Specifically, that order stated:

> The need for corroboration extends to all subsections of 35 U.S.C. 102. *Finnigan Corporation v. Int'l Trade Comm'n*, 180 F.3d 1354, 1367 (Fed.Cir.1999). "In any event, corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Id.* at 1369. Assessing the

sufficiency of evidence which corroborates a witness' testimony concerning invalidating activities, however, falls under a "rule of reason" analysis. Under this analysis, "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed.Cir.1993).

Court concluded that *Finnigan* should not be read so broadly. In stating in *Finnigan* that "[n]o principled reason appears for applying a different rule when other subsections of § 102 are implicated ...," the Federal Circuit seems only to have intended that corroboration is not *exclusively* confined to instances of prior invention and derivation, the only two subsections for which corroboration had been previously required. The Federal Circuit did not intend, it seems on reflection, to extend the corroboration requirement automatically to any and all elements within the subsections of Section 102.

Prior to *Finnigan,* the Federal Circuit, its predecessor courts, and the Supreme Court had required corroboration *only* for oral testimony by witnesses as to alleged prior invention and alleged prior derivation. This was true across countless precedents insofar as the undersigned can now tell. Although those courts had also reviewed many anticipatory-publication cases, they had never imposed a corroboration requirement in such cases. It is doubtful that the Federal Circuit intended to upset this long history with a single sentence, at least without doing so in a clear-cut way. Rather, the better reading of *Finnigan* is that it extended the requirement of corroboration to a claim of prior public use, which on the facts in *Finnigan* resonated with the type of undocumented claims of prior invention that had animated the rule in the first place.

At least two decisions of the Federal Circuit would be hard to reconcile, moreover, with an across-the-board corroboration rule. A dictum in *Carella v. Starlight Archery,* 804 F.2d 135, 138 (Fed.Cir.1986), stated that "in some circumstances *unsupported* oral testimony can be sufficient to prove prior knowledge or use" (emphasis added). More recently and prior to *Finnigan,* the Federal Circuit held in *Thomson, S.A. v. Quixote Corp.,* 166 F.3d 1172, 1175–76 (Fed.Cir.1999), that corroboration was *not* necessary to prove up even anticipation by purported prior inventors who had no stake in the outcome of the litigation:

> The clear and convincing standard of proof required to establish priority, along with the numerous methods in the Federal Rules of Civil Procedure and Evidence by which a party may test, challenge, impeach, and rebut oral testimony, normally protects patentees from erroneous findings of invalidity. *See Price v. Symsek,* 988 F.2d at 1192–94, 26 U.S.P.Q.2d at 1035–36 (discussing standards of proof and requiring interference junior party to establish priority by clear and convincing evidence). Thus, the corroboration rule is needed only to counterbalance the self-interest of a testifying inventor against the patentee. *We therefore hold that corroboration is required only when the testifying inventor is asserting a claim of derivation or priority of his or her invention and is a named party, an employee of or assignor to a named party, or otherwise is in a position where he or she stands to directly and substantially gain by his or her invention being found to have priority over the patent claims at issue.*

*Id.* at 1176 (emphasis added). This statement of the law, particularly the holding italicized above, conflicts with the expansive view of *Finnigan* that Norian advocates. At a minimum, these statements by the Federal Circuit demonstrate that corroboration is not uniformly required for any and all invalidity challenges, much less for each element thereunder.

This order now construes *Finnigan* and the foregoing precedents to mean that corroboration is required for prior inventorship, derivation and public use. Whether corroboration over and above clear and convincing evidence should also be required for other § 102 challenges depends

upon a considered evaluation of each type of challenge. Here, the issue is anticipation via a printed publication. There is no genuine dispute that the abstract was prepared and taken to the 1991 presentation. Its contents are not in controversy. The fact issue is whether copies were available for handout at the conference. Should the requirement of corroboration apply to such an issue, over and above the already-demanding standard of clear and convincing proof?

This order holds that such corroboration should not be required. Corroboration works well in those instances, as *Finnigan* pointed out, that normally generate an "ubiquitous paper trail":

> Mere testimony concerning invalidating activities is received with further skepticism because such activities are normally documented *by tangible evidence such as devices, schematics, or other materials that typically accompany the inventive process. See Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1373, 47 U.S.P.Q.2d 1363, 1367 (Fed.Cir. 1998) (noting that the skepticism with which mere testimony of invalidating activity is received is "reinforced, in modern times, by the *ubiquitous paper trail of virtually all commercial activity.* It is rare indeed that some physical record (*e.g.,* a written document such as *notes, letters, invoices, notebooks, or a sketch or drawing or photograph showing the device, a model, or some other contemporaneous record)* does not exist."); *Eibel Process Co. v. Minnesota & Ontario Paper Co.,* 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523 (1923) (holding that the oral testimony of prior public use "falls short of being enough to overcome the presumption of novelty from the granting of the patent" when "there is not a single written record, letter or specification of prior date to [the patentee's]

application that discloses any such discovery by anyone ...").
180 F.3d at 1366–67 (emphasis added).

Conversely, where corroborating records would ordinarily not be expected, imposing such a requirement would unreasonably impede § 102 defenses and, to that extent, immunize invalid patents from challenge. Here, the issue is the manner and extent to which, if at all, presenters of a research abstract had copies available to hand out. Unlike lab notes and lab work, one would not ordinarily expect records to be kept documenting such accessibility by conference attendees. Of course, the conference itself, the abstract itself, the presentation itself, the indexing and notice of the presentation—all were well corroborated herein. But the act of having copies for ready handout would ordinarily be too casual an event to generate a "ubiquitous paper trail." Consequently, corroboration was not required as long as the jury could reasonably have found, from all the evidence, that the clear-and-convincing standard was met.

\*       \*       \*       \*       \*       \*

Norian's authorities are distinguishable. *Ajinomoto Co., Inc. v. Archer–Daniels–Midland Co.,* 1998 WL 151411 at \*38 (D.Del.1998), held only that a witness who had no actual firsthand knowledge of the procedures employed by a university library, who had not been present at the university library at the time in question, and who admitted there were many details of the cataloging with which he was not familiar, had not given clear and convincing evidence that his thesis in fact had been catalogued and shelved by the critical date. Corroboration was not an issue since the testimony was weak to begin with. Corroboration was not even mentioned in the decision (on this point).

Slightly more supportive of Norian's view is *Benchcraft, Inc. v. Broyhill Furni-*

*ture Industries*, 681 F.Supp. 1190, 1199 (N.D.Miss.1988), holding that deposition testimony can be sufficient to prove the existence and prior art status of a printed publication if it is strong, clear and convincing and corroborated by contemporaneous correspondence or other dated records. *Benchcraft*, however, did not involve the accessibility issue. It involved the more fundamental issue of the very "existence" of such work. One would expect that dated records would ordinarily accompany the prior work there at issue.

At all events, *Benchcraft* is further distinguishable because it relied solely on *Galland–Henning Mfg. Co. v. Dempster Brothers, Inc.*, 315 F.Supp. 68, 81–82 (E.D.Tenn.1970). *Galland* rejected the proposition that an advertising brochure cannot be a printed publication. The patent owner argued that the date and fact of publication cannot be established by oral testimony. The Supreme Court and appellate decisions cited, however, were distinguished in *Galland* as standing only for the proposition that oral testimony *"on the issue of prior invention,* when not otherwise corroborated, must be scrutinized closely and is. insufficient unless it is strong, clear, and convincing, some cases going so far as to state it must establish the facts testified to beyond a reasonable doubt" (emphasis added). On the issue of law, *Galland* did not require corroboration on the publication issue. Rather, it simply stated that the evidence (in that case) was, in fact, strong, clear and convincing and happened to be corroborated as well.

\* \* \* \* \* \*

For all of the foregoing reasons, this order concludes that the instructions correctly imposed the clear-and-convincing standard as to the public-accessibility issue without imposing a further corroboration requirement. Now this order turns to whether, based on the trial record, the jury could reasonably have found that the proper standard was satisfied.

## C. Sufficiency of the Evidence.

■ Under the clear-and-convincing evidentiary standard, this order holds that the trial evidence on accessibility was *not* sufficient. By way of overview of the evidence, the manifest purpose of the 1991 conference and the abstract was to disseminate scientific information among those involved in dental research. Even Norian concedes the genuineness of the abstract and that a copy was, indeed, taken to the 1991 conference. Attendees were given a well-indexed catalog to facilitate locating the time and place of all presentations. Dr. Chow testified that he brought a copy to give to the conference chairperson and that the usual practice at the IADR conferences was for the presenters to have copies at the presentation for handout to attendees. He did not recall, however, whether he was even at the presentation of the paper and could not say whether copies were actually available for handout. The presenters were from a company called Genex Corporation who had made the PBA. They gave a "poster presentation," evidently a verbal talk illustrated by large posters, evidence of which no longer exists in full. Dr. Tagaki was at the presentation but was not asked at trial whether abstract copies were available for handout.

Before turning to the details of the evidence, it is necessary to dispose of Norian's attack on the use of "custom" evidence. Norian faults the witnesses for being unable specifically to recall actually having copies ready for handout. After more than a decade, however, it is understandable that truthful witnesses would ordinarily lack such powers of acute recollection. Custom and practice evidence is admissible and can, if convincing enough, prove up public accessibility. *Constant v.*

*Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1569 (Fed.Cir.1988).

Turning to the details, the critical lapse in the trial evidence concerned whether there were handout copies of the extended abstract at the poster presentation to give to attendees upon request. Significantly, no one who attended the presentation of the abstract testified that handout copies were available.

The most relevant evidence was Dr. Chow's testimony that he had attended the IADR conference from year-to-year and that, in his experience, presenters at the IADR conference would typically have extra copies for handout at their presentations. That was also his personal custom when he served as a presenter. Although he was the last-named co-author, Dr. Chow was not a presenter of the abstract at the 1991 conference. There was no evidence that Dr. Chow even attended the presentation. The presenters for the abstract in question were the scientists who had developed the PBA solution, *i.e.*, the scientists from Genex, namely Dr. B. Link and/or Dr. R. Strausburg, who were the first-named co-authors. Neither testified at trial. There was no evidence concerning what Drs. Link or Strausburg's individual practices were concerning handout copies. There was no evidence that they had ever attended any IADR conference before or were otherwise familiar with any IADR custom concerning handouts. For all the record shows, both may have made cameo appearances at the single presentation completely oblivious as to any custom concerning handouts.

Dr. Chow had no memory of ever handing out a copy of the abstract at the conference (Tr. 566). He brought one copy to give to the session chairperson for later publication in microfiche form. He gave the copy to Dr. Link, the presenter, to be given to the chairperson (Tr. 563). Again, however, the trial record is devoid of any evidence that Dr. Link had any familiarity with any handout custom and/or was even a member or prior attendee of such conferences. Dr. Chow had no memory of Dr. Link giving out handouts of the abstract (Tr. 566).

Unlike Dr. Chow, Dr. Tagaki testified that he actually attended the poster presentation (Tr. 858). Dr. Tagaki, however, was not asked by counsel about handout copies at the presentation. In short, there was no testimony in the trial record concerning any actual handout availability and there was no testimony concerning the custom and practice of the presenters in question, namely Drs. Link and/or Strausburg.

In assessing the evidence at trial, several distinct possibilities suggest themselves. One is Stryker's interpretation—that handout copies were available upon request at the poster presentation. But other plausible scenarios suggest themselves. Since the extended abstract was going to be published in microfiche form (albeit after what proved to be the critical date), the presenters may have assumed that attendees desiring the extended abstract would wait for the microfiche. Alternatively, since the presenters made a poster presentation, the Genex presenters may have felt it more appropriate to hand out copies of the slides or even other material promoting Genex rather than the paper itself. Alternatively, the presenters may have collected business cards with the intent of mailing copies of the abstract, with a degree of follow-up not described at trial. The point is that the "custom" evidence was thin. It hardly ruled out plausible scenarios consistent with validity, at least in a clear and convincing way.

Even though the evidence did not place Dr. Chow at the poster presentation, Stryker argued at the post-trial hearing that the evidence placed him at the overall conference (as it clearly did). Arguing

that Dr. Chow surely had extra copies with him, Stryker's counsel urged that attendees could simply have found him in his hotel room or in the conference or in hotel lobbies and requested a copy. Even indulging an expansive meaning of "presenters" to include "co-authors," and even assuming Dr. Chow navigated the conference with a satchel of handout copies, the proposed scenario would be too haphazard to meet the public-accessibility requirement. Two to three thousand persons attended the conference. Whether and the extent to which the attending public knew Dr. Chow by sight or how to find him among the cast of thousands is too problematic. We must remember that the test is not merely whether the information was in the public domain but also whether it could reasonably be accessed by the public and those skilled in that field of endeavor before the critical date. The scenario drawn by Stryker's counsel would not do.

In sum, the FRCP 50 motion must be granted as to anticipation due to insufficient evidence of public accessibility.

### III.  PROSECUTION–HISTORY EVIDENCE.

■ In order to assess the strength of the presumption of validity, the jury was allowed hear evidence of the prosecution history, particularly the concededly erroneous way in which the '161 Brown and Chow patent was distinguished during prosecution. Although Norian is correct that the defense of inequitable conduct was ruled out of the case before trial, the evidence was nonetheless relevant and was properly admitted. The Court made the following ruling during trial (Tr. 790):

This is not for purposes of inequitable conduct, that the Court's already ruled out of the case; but it is for purposes of allowing the jury to test the strength of the presumption that goes with the presumption of validity. I acknowledge that there's some overlap in purpose,

but it's not going to be for inequitable conduct purposes. If that's all it is, it will be excluded; but so long as the questioning relates to information the jury may legitimately use in deciding whether or not the examiner properly focused on the prior art or was misled as to the prior art, not for purposes of enforcement, but for purposes of whether or not the examiner really did understand what he was ruling, then that's— the case law says that's proper.

In turn, the jury was instructed that "[ ]in determining whether Stryker ha[d] carried that burden [to overcome the presumption of validity by clear and convincing evidence] in this case, you may consider the proceedings before the examiner and the extent to which and the manner in which the prior art was considered by or before the examiner" (Final Charge XVI-II). No objection was made to this instruction (Tr. 1449, 1562). The evidence in question fell squarely under this instruction.

Norian now argues that "[t]he Court previously determined ... that the statements by Norian were not material to the patentability of the '264 patent based on *Akzo N.V. v. U.S. Inter. Trade Commission*, 808 F.2d 1471 (Fed.Cir. 1986)" (Br.8). Actually, the Court never made such a determination. The order granting summary judgment on the inequitable-conduct defense referred to the misrepresentation as of "marginal materiality," but never held they were not material at all. Rather, the order held that, under Federal Circuit authority, the defense of inequitable conduct would not lie where an incorrect representation was made to distinguish prior art but the reference was before the examiner and had been cited by the examiner. This flowed from the presumption that the examiner is skilled in the art and is presumed to understand all a cited ref-

erence teaches. Yet it remains only a presumption, like the presumption of validity, that can be overcome, in part by assessing the quality of the prosecution record before the examiner. Here, all agree that a key reference (the '161 Brown and Chow patent) was distinguished via a factual misstatement as to its teaching. The jury was entitled, in assessing the strength of the validity presumption in this case, to take into account the accuracy of the prosecution history.

## IV. DAMAGES.

■ Contrary to Norian's argument, it is not entitled to a new trial on the issue of damages. The burden of proof was on Norian on the damages issue. The jury could reasonably have concluded that Norian failed to carry its burden due to at least two flaws in its damages study. The first was its assumed date of first infringement. Norian's expert based his study on a flawed first date of infringement, well before Stryker began to infringe. The expert report did not posit an alternative date. Although the instructions allowed Norian to argue that the circumstances would have been similar as between the

two dates, the jury could reasonably have disagreed with Norian's conclusory argument on this score (Final Charge XLI).[4] Second, Norian's damages theory assumed that *all* of the so-called "royalty relief" provisions would have been given up by Stryker in order to obtain a license from Norian (in the hypothetical-negotiation analysis) (TX 578; Tr. 318–20).[5] This monumental assumption was so brazen that the jury may well have distrusted all of the expert's damages analysis and found that Norian had not met its burden of proof. When a party goes for a home run and fails, the jury is not required to award a single merely because the party might have reached base with a more moderate stroke. Nor is a new trial in order so that the party can try again with a more reasonable strategy.

## CONCLUSION

On obviousness, Norian's post-trial motions are **DENIED**. There was clear and convincing evidence to support the jury's finding that the claims-in-suit would have been obvious in light of the '161 Brown and Chow and the '888 Iwamoto patents. Relief under FRCP 50 is not warranted. Relatedly, the jury's finding was not against the clear weight of the evidence.

4. Specifically, Norian's expert testified (Tr. 332–33):

> Q. If you accepted Mr. Vogler's argument that that would be the correct date [December 4, 1998] for your analysis, how would your hypothetical negotiation analysis change?
>
> \* \* \* \* \* \*
>
> A. It would not change the royalty rate of 15 percent, because the facts that are relevant in the late 1997 are equally relevant in late 1998. It would change the base against which you would apply that 15 percent rate.
>
> \* \* \* \* \* \*
>
> Q. The short answer would be that your royalty rate, of 15 percent, would or would not change?
>
> A. Would not.

5. Norian's damages expert based his opinion, in large part, on the "royalty relief" provisions within Stryker's BoneSource licensing contracts. Specifically, these "royalty relief" provisions typically stated that if Stryker had to obtain an additional license from a different party to continue selling BoneSource, then Stryker's royalty obligation to the initial licensor would be reduced or offset by the amount paid to the different party for the additional license. This offset was limited to a maximum reduction of fifty percent of the original amount owed to the initial licensor. Norian's expert then extrapolated a base for the reasonable-royalty rate due to his assumption that Stryker would have agreed to pay Norian the equivalent of *all* its "royalty relief" and would not have tried to preserve any relief for future contingencies.

On anticipation, Norian's post-trial motion under FRCP 50 is **GRANTED.** There was not substantial evidence to support the jury's finding of an anticipatory "printed publication." Specifically, no reasonable jury could have concluded that there was clear and convincing evidence establishing accessibility of the 1991 IADR Extended Abstract.

On damages, Norian's post-trial motion under FRCP 59 is **DENIED.** The jury's finding that Norian had not established a reasonable royalty rate was not against the clear weight of the evidence, especially in light of the two flaws in its damages theory. It was also proper for the jury to hear evidence of inaccurate representations to the examiner (concerning the '161 Brown and Chow patent) in order to assess the strength of the presumption of validity. The judgment for Stryker must stand but is modified as indicated on the anticipation issue.

**IT IS SO ORDERED.**